IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
July 24, 2012 Session

**STATE OF TENNESSEE v. GEORGE R. THACKER**

**Direct Appeal from the Criminal Court for Sullivan County**
**No. S55532    Robert H. Montgomery, Jr., Judge**

**No. E2011-02401-CCA-R3-CD - Filed September 18, 2012**

A Sullivan County jury convicted the Defendant, George R. Thacker, of solicitation to commit first degree murder, and the trial court sentenced him to eleven years as a Range I, standard offender. On appeal, the Defendant contends that the trial court erred when it declined to instruct the jury on the defense of entrapment and the law regarding accomplice testimony. After a thorough review of the record and relevant authorities, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR. and ROGER A. PAGE, JJ., joined.

James T. Bowman, Johnson City, Tennessee, for the appellant, George R. Thacker.

Robert E. Cooper, Jr., Attorney General and Reporter; Leslie E. Price, Assistant Attorney General; H. Greeley Wells, Jr., District Attorney General; Barry Staubus and Teresa Nelson, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**I. Facts**

This case arises from the Defendant's payment to another person to kill his cousin, Horton Denver, over an estate dispute. For this conduct, a Sullivan County grand jury indicted the Defendant for solicitation to commit first degree murder. At the Defendant's trial on this charge, the parties presented the following evidence: Denver Horton testified that he was a retired Internal Revenue Service agent and lived in Brentwood, Tennessee. Horton

explained that the Defendant's mother is Horton's first cousin. Before their dispute over a family member's estate, Horton said that he and the Defendant never visited one another but would occasionally see each other at family gatherings.

Horton testified that, in 2001, his and the Defendant's aunt died, and the chancery court appointed him as the administrator of her estate. As the administrator, Horton was involved in the review of his aunt's financial affairs. As a result of this review, Horton filed a civil lawsuit on behalf of his aunt's estate against the Defendant. Horton said that, in 2008, at the conclusion of the lawsuit, the estate received a $45,000 judgment against the Defendant. In June 2008, Horton, acting on behalf of the estate, filed a motion requesting interest on the judgment and reasonable expenses for a total judgment amount of $140,000. Horton testified that the last time he saw or spoke to the Defendant was in the courtroom during the civil proceeding involving his aunt's estate.

On cross-examination, Horton testified that he also filed another civil lawsuit against the Defendant in Florida involving a bank account. Horton said that the Florida lawsuit settled.

Sarah Housewright, the Sullivan County Chancery Court Clerk and Master, testified that part of her work duties was to keep records for the civil cases filed in the Sullivan County Chancery Court. Housewright confirmed that she maintained the records for the civil action relevant to this case and that, on May 27, 2008, a judgment was rendered against the Defendant in the amount of $45,000 plus interest. Housewright said that, after that judgment, two motions for discretionary costs were filed by the estate on June 23, 2008, and June 25, 2008. The Defendant also filed a notice of appeal in the civil action on June 25, 2008.

Patricia Leffler testified that, in 2008, she lived in North Carolina and traveled to Virginia on a regular basis. Leffler said that she met the Defendant through his wife. The Defendant owned a pawn shop, and Leffler assisted the Defendant in his business. Leffler recalled that in the spring of 2008 she was indicted on criminal charges, and the Defendant learned of these charges due to the press coverage of her indictments. Leffler said the Defendant's relationship with her "changed" at this point. She described the Defendant as "getting friendlier" and "opening up more." She said the Defendant told her that he and Leffler were "cut from the same cloth" and "understood each other."

Leffler testified that, after the Defendant learned of her pending charges and had become "friendlier," he disclosed that his cousin had filed a lawsuit against him and won. The Defendant told Leffler that the judgment was in excess of $40,000.00, and the Defendant had filed an appeal. Leffler described the Defendant's demeanor as "angry" when he talked about the lawsuit, and he said he was "not going to give [Horton] a dime of that money."

2

Leffler said that she did not know the Defendant's cousin but that the Defendant told her that he lived in Brentwood, Tennessee, he was his aunt's son, and he worked for the Internal Revenue Service.

Leffler testified that, in July 2008, the Defendant told her that he had a court hearing on the appeal and that he wanted to have his cousin "'eliminated' before the case [went] before the judge." The Defendant did not want Horton to appear in court so that the Defendant would win the appeal. Leffler said that the Defendant believed that she knew people who could "help eliminate" Horton. Leffler agreed to help the Defendant, and he gave Leffler a thousand dollars "to secure someone to have that done." The Defendant also told Leffler that, if she assisted him, in return he would help her with some of her legal problems.

Leffler testified that, after the Defendant gave her the money, she decided to notify law enforcement. She explained this decision as follows:

> That was a very - - - that was a difficult decision for me because my motivation at that time in my life was money. I was in a child custody battle for my son and it was very expensive and it was a very low point in my life and I was doing a lot of things wrong myself. The money was what I needed but when the conversation started to turn, when he started talking about hurting people[,] I didn't know what to do with that at that time because at first I didn't even know that he was serious[,] but when it became obvious to me that he was very serious about doing these things[,] I had a decision to make and it was hard because all I cared about in those days was my son, fighting, winning custody of him and also of getting out of trouble myself because I was in some trouble with financial charges due to fighting for custody of my son. I had accrued a number of criminal charges personally but again when it came to that I had to make a decision and that's the one I made.

Leffler testified that, after receipt of the money, she met with an attorney who arranged a meeting with a Tennessee Bureau of Investigation ("TBI") agent, Brian Prichard. During the time Leffler was working with Agent Prichard, she continued to talk to the Defendant on the telephone. She told the Defendant she had found someone to "eliminate" Horton. Leffler arranged to meet the Defendant at the Meadowview Conference Center in Kingsport, Tennessee, to introduce the Defendant to Woodward, an undercover TBI agent acting as the individual hired to kill Horton.

Leffler testified that, on the day of the meeting, multiple recorded phone calls were exchanged between Leffler and the Defendant. Leffler recalled that she first met Agent

Prichard and Agent Woodward at the Kingsport Police Department, where she was outfitted with a recording device. She then rode with Agent Woodward to the Meadowview Conference Center. Leffler confirmed that she was in the vehicle with Agent Woodward during the entire meeting. The Defendant arrived at the agreed upon location alone. He met with Leffler and Agent Woodward, left for approximately an hour, and then returned with $500.00 for Agent Woodward.

Leffler agreed that she had previously been convicted of criminal offenses including theft, passing useless checks, the fraudulent use of credit cards, and identity theft. She denied ever asking for any leniency on her criminal charges in exchange for her testimony or cooperation with this case. Leffler said that she was not compensated or offered any "deals" in exchange for her cooperation.

On cross-examination, Leffler testified that she was convicted of approximately fifty offenses involving fraud, theft, or dishonesty between the years 2000 and 2010. Leffler agreed that, from the time the Defendant learned of her pending criminal charges until he gave her the $1,000 to hire someone to "eliminate" his cousin, the Defendant gave Leffler "financial assistance" of "several thousand dollars." Leffler said that it was her understanding that the Defendant's wife was unaware he gave Leffler money.

Brian Prichard, a TBI agent, testified that an attorney contacted him on July 22, 2008, about a potential "murder for hire." Agent Prichard interviewed Leffler that same day and initiated an investigation of her allegations that the Defendant was attempting to hire someone to kill his cousin, Denver Horton. Agent Prichard said that Leffler told him that the Defendant sought to have Horton killed due to a civil dispute involving money.

Agent Prichard testified that, as part of the investigation, he requested assistance from surrounding agencies. Leffler told Agent Prichard that the Defendant expected a female from North Carolina to conduct the crime, so Agent Prichard selected Teresa Woodward, a TBI agent from the Knoxville Drug Division office, to pose as the female "hit person." Agent Prichard arranged for an undercover operation to be held on July 24, 2008, during which the Defendant would meet with Leffler and Woodward. Agent Prichard assembled all personnel needed, surveillance equipment, and a Chevrolet Suburban with a North Carolina license plate for Woodward and Leffler to drive to meet the Defendant.

Agent Prichard testified that, once located at Meadowview Convention Center with Woodward and Leffler, Leffler called the Defendant and left a voicemail message. Ten minutes later, Leffler called again, and the Defendant did not answer. Approximately fifteen to twenty minutes later, the Defendant returned the phone call to Leffler. Agent Prichard overheard Leffler tell the Defendant that Woodward was "in town and available" and to meet

4

Woodward and Leffler at the Meadowview Convention Center parking lot. Agent Prichard then moved to his vehicle where he monitored the audio/video equipment.

Approximately fifteen to thirty minutes later, the Defendant arrived in a white Dodge dual wheel pickup. The Defendant was alone, exited his vehicle, and entered the passenger side rear door of the undercover vehicle. Agent Prichard monitored the approximately thirty-minute long discussion that took place in the undercover vehicle. The conversation centered around the price to initiate the murder of Horton. The price was agreed upon, $500 for traveling expenses and another $1,000 after completion. The Defendant exited the undercover vehicle to go and get the initial $500. The Defendant left in his vehicle for approximately thirty to forty-five minutes, returned, and again entered the undercover vehicle. The Defendant provided the agreed upon $500 in cash. Upon receipt of the money, Woodward said the prearranged code word and officers approached the undercover vehicle, arresting the Defendant.

Agent Prichard testified that the Defendant did not appear to be under the influence of alcohol or drugs at the time of his arrest. Subsequent to the arrest, Agent Prichard searched the Defendant's vehicle and found another envelope containing $570.00 in cash, the Defendant's cell phone, and chancery court documents related to the civil suit between the Defendant and Horton. Agent Prichard also collected $500.00 in $20 dollar bills from Woodward that she received from the Defendant.

Agent Prichard confirmed that he had not made any promises to Leffler in exchange for her cooperation and assistance in this case. Agent Prichard said that Leffler never asked for anything in exchange for her assistance.

On cross-examination, Agent Prichard testified that he wrote down a summary of Leffler's initial statement to him on July 22, 2008. At the time, Leffler was on her way to North Carolina, so Agent Prichard was unable to review the statement with her until July 24, 2008. On July 24, 2008, Leffler signed and dated the statement. Agent Prichard agreed that, in the statement, there was no mention of the $1,000 the Defendant gave Leffler for the solicitation. Agent Prichard said that he did not learn of the $1,000 payment until July 24, 2008. Agent Prichard explained that, before the meeting with the Defendant, Leffler was searched and $1,000 was found on her person. At that time, Leffler said, "That's [the Defendant's] money." She asked Agent Prichard to return the money to the Defendant's family. Agent Prichard said that he told Leffler he could not return the money for her and that she would need to arrange to do so on her own. He explained that, at the time, he believed the money was a "debt owed" and did not understand the money to be related to the case. He later learned that the $1,000 was the money the Defendant gave to Leffler to procure someone to kill Horton. Agent Prichard said that, if he had understood the money

to be related to the case, he would have seized the money at that time.

Agent Prichard testified that, during his first conversation with Leffler, he advised her not to have any contact with the Defendant. He later learned that Leffler continued to communicate with the Defendant. Agent Prichard said that Leffler provided him with audio recordings of her conversations with the Defendant but that the recordings were inaudible.

Jamie Jenkins, a Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") special agent, testified that he assisted in an investigation involving the Defendant. Agent Jenkins testified that he was present at the Meadowview Conference Center during the meeting but did not have a view of the actual meeting. At some point, he was notified that the Defendant was leaving in his vehicle, and Agent Jenkins followed to maintain "loose surveillance." The Defendant traveled to his shop, where he went inside briefly, and then returned to the Meadowview Conference Center, making one stop at a Lowe's on the way.

Teresa Woodward, a TBI agent, testified that she posed as a "hit person" from North Carolina during an undercover operation involving the Defendant. The day of the meeting, she went to the Kingsport Police Department where she met the other individuals involved with the case. She said that she searched Leffler before the meeting and found $1000 in cash and gave it to Agent Prichard. Woodward said she could not recall whether she asked Leffler about the money.

Woodward testified that she sat in the driver's seat, and Leffler sat in the passenger seat as they waited for the Defendant at the Meadowview Conference Center. The Defendant arrived alone in a truck. He got into the back seat of the surveillance vehicle and introduced himself to Woodward. Woodward said that, according to Leffler, the Defendant believed Woodward had "already" been hired but that she could not find the location of the Defendant's cousin. The Defendant provided Horton's name and home address to Woodward. The Defendant told Woodward that he would provide another address for Horton the next day because he did not have the alternate address with him at the time. Woodward told the Defendant she wanted $500 "up front for travel" and $1,000 when "the job [was] done." The Defendant told Woodward that he and Horton were involved in a civil dispute over their aunt's estate. Woodward said that the Defendant never used the word "kill" during their conversation. She described a portion of their conversation as follows:

> At one point he, when I asked him what he wanted done, he said, you know, "If you knew what I wanted you'd think I was crazy." And I said, "What was that." He said, "I'd like to see him castrated with his balls and his pecker crammed down his mouth until he choked."

Woodward said that the Defendant said he wanted "to eliminate [the victim] or erase the issue."

Woodward testified that the Defendant said that he did not have any cash with him, so he offered to go get the cash and return. The Defendant left for approximately forty-five minutes and returned in the same vehicle. The Defendant returned to the surveillance vehicle and handed Woodward $500 in cash for Woodward to drive to Nashville and locate Horton. Woodward said that she counted the cash and then asked the Defendant if he wanted proof. The Defendant responded that if Woodward told him "it was done[,] it's done." Woodward then said the code word to signal other officers to move in for the Defendant's arrest. Woodward gave the $500 to Agent Prichard.

The State played the recording of the Defendant's meeting with Woodward for the jury. On the recording, the Defendant, Woodward, and Leffler initially engaged in small talk until Leffler directed the conversation toward the reason for the meeting. Woodward told the Defendant she was having difficulty locating the victim, and he told her that he would provide her with another address on the following day. The Defendant explained to Woodward that he did not bring the address with him because he did not realize he would need it. Woodward asked questions about the intended victim. The Defendant told Woodward the victim's name, approximate age, that he was married, lived in Brentwood, and was employed with the Internal Revenue Service. The Defendant and Leffler then engaged in the following exchange:

| | |
|---|---|
| Woodward: | Well, here's the deal. If you want me to take care of this for you I've got to have some cash if you - - - |
| Leffler: | She needs a little more [money] than what I gave her. |
| Woodward: | [S]ince we've already used the other money, $500.00 will get me down there with my buddies. We'll stay a few days to locate him, okay. In the meantime while I'm goin' down there I'll be on the phone with you to get the address or whatever, let you locate it, if you want to go that route. |
| The Defendant: | Or I can give her the address and you call her, either one? |
| Woodward: | Either one. |
| The Defendant: | I'll make sure [Leffler] keeps up with it this time. I'll |

7

tattoo it on her.

Woodward: But the money, to get down there, I want half of it, $500.00 to get down there and when I get back a thousand. And if you like what I do then we'll go from there.

The Defendant: Okay. You got any money you can give her because I ain't got none with me.

Leffler: You don't have money at all?

The Defendant: I ain't got nothin' with me. The damn bank is done closed over here. I can't get none out.

Woodward: Now, is there anything in particular you want me to - - - how do you want me to handle it? Do you want me to be quick? You want me to use a gun? You want me to use a knife? What do you want?

The Defendant: If I told ya' what I wanted you'd probably think I was crazy.

Woodward: What do you want?

Leffler: You probably would. I couldn't even do it.

Woodward: What do you want?

The Defendant: As I told [Leffler] the other day, I'd like to see him castrated and his balls and his pecker crammed in his mouth until he was choked on it.

Woodward: Well, do you want me to make it look like somebody stole s**t from him or I mean - - -

The Defendant: Well, that'd be the best probably.

Woodward: Just make sure that it looks like that somebody stole s**t from him?

8

The Defendant:    Yeah, just take whatever is there available, just take somethin' or other and I'm sure there's gonna be jewelry boxes or somethin' other sittin' around and I don't know what else.

Woodward:    Well, I'm not gonna - - -

The Defendant:    If you don't want to hang onto it just take it out there and throw it in the dumpster. I don't give a s**t. If you take somethin' or other out of the house and they'll think that that's what it was about to start with.

Woodward:    Well, do you want him to know before he goes?

The Defendant:    No, honey, I don't want to put you or me or nobody else in jeopardy over it. He's just an erasable issue to me.

Woodward:    So whether he goes fast or slow it don't matter.

The Defendant:    It don't make a damn to me. If I was doin' it I'd make him go slow if I had the time, if I could be there and do it because [of] the aggravation he put me through especially whenever I was already locked up and they was up here harassin' my mother. I'd make him go through - - - - real damn slow. (Unintelligible).

Woodward:    . . . What kind of proof do you want cause it's not like - - - - it sounds to me like it's not like you can call him to see if he's there or not. What kind of proof do you want to prove that I did follow through with it?

The Defendant:    If you cut anything off him and you bring it back it just puts you in danger, too, more jeopardy though.


The Defendant told Woodward that he would go to the bank the following morning and have the $500 for her by 10:00 a.m. Woodward asked the Defendant if he could get a gun. The Defendant responded that he cannot possess a gun and that, if he could, he would "go down there" and "do it [him]self." Leffler told the Defendant that his not having the money until the next morning "change[d] their plans," but the Defendant maintained that he could not get

9

any money that day. They discussed business related to the pawn shop and then the fact that the Defendant appealed the civil case involving the victim. Then the following exchange occurred:

| Leffler: | But you want him to - - - - you know, like I said, I'm not very good at this. She knows that I'm not. I can't even say he, you know, "kill him." But that what you want, right? |
|---|---|
| Woodward: | Well - - - |
| The Defendant: | Well, any other way it's gonna keep comin' back, I done learned that. |

The Defendant again stated that he would provide Woodward with the victim's address the following day. He then discussed the litigation with the victim again. The Defendant said that if the victim was not "there in the appeals court to testify then the appeals court might go the other way." Woodward said that they need to get started on this "today" to make sure it is "done before [the] next court date." The Defendant said that he would have the money in the morning. Woodward then said, "Well, if you can't get the money tonight - - -." The Defendant responded, "Where you all gonna be at in a couple of hours?" The Defendant, Woodward, and Leffler then began to discuss the logistics of the Defendant's getting the money at that time. After some discussion of what Leffler and Woodward would do while waiting, they agreed that the Defendant would go to his pawn shop and return with money while Leffler and Woodward got something to eat nearby.

When the video recording resumed, which was after the Defendant returned to the undercover car after driving to his pawn shop to retrieve money, the Defendant gave the money to Woodward and told her to "count it."

Based upon this evidence, the jury convicted the Defendant of solicitation to commit first degree murder. The trial court sentenced the Defendant to eleven years as a Range I, standard offender. It is from this judgment that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant contends that the trial court erred when it refused to instruct the jury on the defense of entrapment and the law regarding accomplice testimony. The State responds that the proof at trial did not support instructions for entrapment or for accomplice

testimony. We agree with the State.

A trial court has the duty, in criminal cases, to fully instruct the jury on the general principles of law relevant to the issues raised by the evidence. *See State v. Burns*, 6 S.W.3d 453, 464 (Tenn. 1999); *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn. 1986); *State v. Elder*, 982 S.W.2d 871, 876 (Tenn. Crim. App. 1998). Nothing short of a "'clear and distinct exposition of the law'" satisfies a defendant's constitutional right to trial by jury. *State v. Phipps*, 883 S.W.2d 138, 150 (Tenn. Crim. App. 1994) (quoting *State v. McAfee*, 737 S.W.2d 304 (Tenn. Crim. App. 1987)). In other words, the trial court must instruct the jury on those principles closely and openly connected with the facts before the court, which are necessary for the jury's understanding of the case. *Elder*, 982 S.W.2d at 876. Because questions regarding the propriety of jury instructions are mixed questions of law and fact, our standard of review here is *de novo*, with no presumption of correctness. *State v. Rush*, 50 S.W.3d 424, 427 (Tenn. 2001); *State v. Smiley*, 38 S .W.3d 521, 524 (Tenn. 2001).

"A defendant has a constitutional right to a correct and complete charge of the law." *State v. Teel*, 793 S.W.2d 236, 249 (Tenn. 1990), *superceded by statute on other grounds as stated in State v. Reid*, 91 S.W.3d 247 (Tenn. 2002). When reviewing jury instructions on appeal to determine whether they are erroneous, this Court must "review the charge in its entirety and read it as a whole." *State v. Hodges*, 944 S.W.2d 346, 352 (Tenn. 1997) (citing *State v. Stephenson*, 878 S.W.2d 530, 555 (Tenn. 1994)). The Tennessee Supreme Court, relying on the words of the United States Supreme Court, has noted that:

> [J]urors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might. Differences among them in interpretation of instructions may be thrashed out in the deliberative process, with commonsense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting.

*Id*. (quoting *Boyde v. California*, 494 U.S. 370, 380-81 (1990)). A jury instruction is considered "prejudicially erroneous," only "if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." *Id*. Even if a trial court errs when instructing the jury, such instructional error may be found harmless. *State v. Williams*, 977 S.W.2d 101, 104 (Tenn. 1998). With this in mind, we turn to the Defendant's claims with regard to his jury instructions.

### A. Entrapment

Tennessee Code Annotated section 39-11-505 provides for the entrapment defense as follows:

11

It is a defense to prosecution that law enforcement officials, acting either directly or through an agent, induced or persuaded an otherwise unwilling person to commit an unlawful act when the person was not predisposed to do so. If a defendant intends to rely on the defense of entrapment, the defendant shall give to the district attorney general a notice comparable to that required for an insanity defense under Rule 12.2 of the Tennessee Rules of Criminal Procedure.

This Court, in *State v. Blackmon*, further described the threshold showing needed for a trial court to instruct on entrapment:

The threshold question of whether the defense of entrapment has been "fairly raised" is for determination by the judge and not the jury. Nonetheless, where the proof fairly raises the issue of entrapment, and the proof is supported by credible evidence, the trial court is required to give the instruction of entrapment whether requested or not. To determine when this statutory defense is fairly raised by the proof so as to require its submission to the jury, a court must, in effect, consider the evidence in the light most favorable to the defendant, including all reasonable inferences flowing from that evidence. *See State v. Bult*, 989 S.W.2d 730, 733 (Tenn. Crim. App. 1998), *perm. to appeal denied*, (Tenn. 1999) (*citing State v. Shropshire*, 874 S.W.2d 634, 639 (Tenn. Crim. App. 1993)). Thus, if entrapment is, in fact, "fairly raised by the proof," the issue of predisposition becomes a question of fact for the jury. *See also Sherman v. United States*, 356 U.S. at 377, 78 S.Ct. 819.

78 S.W.3d 322, 331 (Tenn. Crim. App. 2001).

In denying the Defendant's request that the jury be instructed on the defense of entrapment, the trial court stated:

[T]he [D]efendant came to the location where the officer and the informant were after discussion there about what the defendant wanted the undercover agent to do. He was the one that left and then he came back on his own and I don't see how that in any way, based on those kinds of facts, raises any kind of issue with regard to - - - - let's see, let me look at that instruction again - - - - talk about threats, coercive tactics, harassment, promises of award, pleas based on need, sympathy, friendship, persuasion. In my opinion[,] all the proof that I've heard so far does not raise any of those kinds of issues . . . I don't find that it's been raised by the evidence.

12

In considering the evidence in the light most favorable to the Defendant, it supports the trial court's conclusions. The Defendant became "friendlier" with Leffler after he learned of her criminal activity leading up to his disclosure that he wished to "eliminate" his cousin over an estate dispute. The Defendant provided Leffler with $1,000 to find a person to "eliminate" Horton. The Defendant willingly drove to meet Leffler and the undercover agent. The Defendant provided Woodward with specific information about Horton in order for Woodward to locate Horton. The Defendant also graphically described how he would prefer that Horton be eliminated. Over the course of their meeting, the Defendant agreed to terms of payment, and the Defendant drove to his shop alone, retrieved money for that purpose, and returned of his own accord to give the money to Woodward.

Accordingly, we cannot conclude the issue of entrapment was "fairly raised by the proof." *Blackmon*, 78 S.W.3d at 331. The evidence supports the trial court's denial of the requested jury instruction on the defense of entrapment. The Defendant is not entitled to relief as to this issue.

### B. Accomplice Testimony

It is well-settled law in Tennessee that a criminal defendant cannot be convicted solely on the uncorroborated testimony of an accomplice. *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994). Whether the testimony of an accomplice has been sufficiently corroborated is a question for the jury. *State v. Heflin*, 15 S.W.3d 519, 524 (Tenn. Crim. App. 1999). An accomplice is one who "knowingly, voluntarily and with common intent participates with the principal offender in the commission of the crime alleged in the charging instrument." *State v. Griffis*, 964 S.W.2d 577, 588 (Tenn. Crim. App. 1997). To satisfy the definition of an accomplice, it is not enough that the witness merely possess guilty knowledge, is morally delinquent, or even participated in a distinct but related offense. *See State v. Lawson*, 794 S.W.2d 363, 369 (Tenn. Crim. App. 1990). The determination as to whether a witness is an accomplice or not may be a matter of law for the trial court's determination or it may be a question of fact for the jury's determination. *State v. Perkinson*, 867 S.W.2d 1, 7 (Tenn. Crim. App. 1992).

The Defendant asserts that there was sufficient evidence for the jury to conclude that Leffler was an accomplice as a matter of fact because she accepted the $1000 given to her by the Defendant to hire someone to kill Horton. The trial court acknowledged that Leffler received the $1,000.00 from the Defendant but stated that Leffler then reported the Defendant's solicitation to authorities. The trial court found that there was no evidence to support that Leffler acted with a common intent with the Defendant to kill Horton.

13

Our review of the evidence supports the trial court's denial of a jury instruction on accomplice testimony. The proof at trial was that Leffler worked with the Defendant on business related to his pawn shop. After the Defendant learned of Leffler's criminal activity, he became "friendlier" with her and ultimately divulged his anger over an estate dispute with his cousin, Horton. The Defendant asked Leffler to find someone to "eliminate" Horton and gave Leffler $1000.00 to do so. Leffler took the money but then contacted an attorney who contacted the TBI. Leffler fully cooperated with the investigation. These facts do not demonstrate that Leffler "knowingly, voluntarily, and with common intent participate[d] with the principal offender in the commission of [the] offenses." *State v. Lewis*, 36 S.W.3d 88, 94 (Tenn. Crim. App. 2000) (citing *Lawson*, 794 S.W.2d at 369).

Accordingly, we conclude that the trial court did not err by declining to instruct the jury that Leffler was an accomplice as a matter of law or that they could determine that she was an accomplice as a matter of fact. The Defendant is not entitled to relief as to this issue.

### III. Conclusion

After a thorough review of the record and relevant authorities, we affirm the judgment of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE

14